We'll hear argument first this morning in Case 11-564, Florida v. Jardines. Mr. Garre. Thank you, Mr. Chief Justice, and may it please the Court. In the three prior cases in which this Court has held that a dog sniff is not a search, this Court has emphasized that a dog sniff is unique, both in terms of the manner in which information is obtained and the nature of the information revealed. As to the latter point, this Court has emphasized that a drug detection dog reveals only the presence of contraband, and that no one has a legitimate expectation of privacy in that. Kennedy I mean, that just can't be a proposition that we can accept across the board. Nobody under that view has an interest in contraband in their home. The question is, can you find out the contraband? It's just a circular argument. And in the – was it the Cabales case that talked about that, if I have the right name? That was where the contraband was visible. It was almost like the smoking gun falls out. Well, of course, there's no interest in the smoking gun when it falls out in front of you. So I just don't think that works. Well, Justice Kennedy, in the Cabales case, the contraband was invisible before the dog alerted. In the home case, we're not saying that you don't have a legitimate expectation of privacy in the home. Of course you do. The question is whether you have a legitimate expectation. Sotomayor So doesn't that mean that what's in your home that's not visible to the public has an expectation of privacy as well? Not when it comes to a contraband, Your Honor. And we think that the Kyllo case helps. But that is circular. Then why do you need a search warrant? If you have no expectation of privacy in the contraband, why bother even with a search warrant? Because, Your Honor, when you have a search warrant and you go into a home, there's going to be a lot of private information that you're going to come across, even if your expectation is of finding evidence of a crime. Ginsburg Mr. Garre, does your argument mean, you say, minimally intrusive and the dog will detect only contraband, that the police then are at liberty, say, to go into a neighborhood that's known to be a drug-dealing neighborhood, go into, just go down the street, have the dog sniff in front of every door, or go into an apartment building? Is that the – I gather that that is your position. Garre, Your Honor, they could do that, just like the police could go door to door and knock on the doors and hope that they will find out evidence of wrongdoing that way. The two responses this Court has always pointed to is the restraint on resources and the check of community hostility. Here, the police were combating a serious academic epidemic of grow houses, hundreds of houses each year that were a scourge to the community, not only in terms just of the drugs that they were growing, but the drugs that they were selling. Suppose the house had on the lawn no dogs allowed? I think that would be different, Your Honor. It would be different. And that's a way in which the house is different than a car. Homeowners can restrict access to people who come up to their front door by putting gates or sign out of the house. Well, that's right, and there's such a thing as what is called the curtilage of a house. As I understand the law, the police are entitled to use binoculars to look into the house if the residents leave the blinds open, right? That's right. But if they can't see clearly enough from a distance, they're not entitled to go onto the curtilage of the house inside the gate and use the binoculars from that vantage point, are they? They're not, Your Honor. Why isn't it the same thing with the dog? This dog was brought right up, right up to the door of the house. Your Honor, first of all, I think that as this case comes to the Court, the police were lawfully present at the front door. That was established by the courts below, and we don't think that they've challenged it here. That's at least true with respect to the police officer. The police officer could go up to the front door and knock and detect the smell of marijuana, just like Officer Pedraja did. Well, then we've taken an unrealistic case if that has been conceded, because it seems to me crucial that this officer went on to the portion of the house that as to which there is privacy, and used a means of discerning what was in the house that should not have been available within that space. Well, I think the way you would answer that question, Your Honor, is of course there's a curtilage that extends around the house and protects in which a homeowner has a reasonable expectation of privacy. It's well established, we think, going back to the common law, that there is an implied consent for people, visitors, salesmen, Girl Scouts, trick-or-treaters, to come up to your house and open the door. Ginsburg. Yes, but not implied consent for the policeman to come up with the dog. The only purpose of the dog is to detect contraband. So you can say, yes, there's an implied invitation to the Girl Scout cookie seller, to the postman, even to the police officer, but not police officer with dog, when the only reason for having the dog is to find out if there's contraband in the house. Well, Justice Ginsburg, first of all, I think if the Girl Scout or the salesman or the trick-or-treater brought up a dog with them, there would be complied consent for that, too, at least as long as the dog was on the leash. I don't think the subjective. This is not any dog. This is a drug-detecting dog. No, that's right. But I don't think it changes the subjective purpose of why they brought the dog with them. Sotomayor Why is that an implied consent? That's a huge assumption. At least in the cities that I've lived in, you have to have a dog on a leash. And you don't give implied consent. If you're allergic to animals, you don't want dogs walking around at your door. Well, you can certainly put the no dogs allowed sign up front, and there, there would not be implied consent. Sotomayor But tell me why you presume that there's implied consent. Well, we start with the proposition that Sotomayor Do you think homeowners freely let dogs just come into their apartment? I mean, there might be some homes that do. Certainly not in the apartment, Your Honor. This search took place. A dog walked up the same way that a salesman would and alerted at the front of the door. He didn't go in. Sotomayor So we're going to treat it like a human being now? You're invited to knock on my door because it's your dog? No, I think certainly this is true in my neighborhood, Your Honor. Neighbors can bring their dog up on the leash when they knock on your front door, and I think that's true in most neighborhoods in America. Homeowners that don't like dogs and want them off their property have a way to combat that, and that's putting a fence around it to say no dogs allowed. Sotomayor So now we tell all dog dealers put up a sign that says no dogs? Well, they could, Your Honor. There are certainly houses that have that. But with respect to the question of Sotomayor Isn't it better just to assume that what's logical? I let people knock on my door because they have to say something to me. I don't let a dog come up to my door. I don't willy-nilly invite it to come up to my door. And I think, Your Honor, I think the reason why that doesn't work here is that if you ask that question with respect to the officer, I think it's well settled or accepted that police officers can walk up the front path, absent a sign or something, knock on the door. That invite and sent, does that include them coming up and up to your porch and sweeping stuff into a garbage pan? I don't think it would, Your Honor. I think that we're talking about going up there, knocking on the door. The police officer can not Scalia Police officers can come there to knock on the door, but I thought you conceded that police officers can't come there to look into the house with binoculars, right? When the purpose of the officers going there is to conduct a search, it's not permitted. If the purpose of the police officer here, for example, was to walk up to the house, hope that they answered the door, or hope that once they were up there, they would smell the odor of marijuana, as Officer Pedraja did, that would not convert it into a search. There was no invasion, physical invasion. Breyer It's true, but if you're looking at expectation of a reasonable homeowner, imagine you have a home, a long driveway, you do expect people to come up and come into the house, knock on the door, maybe even with dogs. Do you expect them to sit there for 5 to 15 minutes, 15 minutes, not knocking on the door, doing nothing? I mean, is that something I wouldn't — would you be nervous about that? Anyone coming to your door and not knocking? Just sniffing. Well, I think everyone accepts when someone comes to your door, they can avail themselves of their God-given senses, whether it's looking into a window without binoculars, taking — breathing in and smelling the air, as Officer Pedraja did. I don't think there's a constitutional difference when people do that. Breyer No, there is in this sense. Justice Scalia just said it. He said you do have an expectation of people coming into your door, perhaps even with animals, perhaps even with binoculars. But not looking into the house, not looking into the house from the front step with the binoculars. Now, why is that unconstitutional? Because it's very unusual that someone would do that, and a homeowner would resent it. Would a homeowner resent someone coming with a large animal, sitting in front of the front step on his property, and sitting there sniffing for 5 to 15 minutes? Forget the sniffing. Just talking. Loud noises. Is that something that you invite people to do? Roberts Your Honor, what I think you can say there's implied consent to is a dog accompanying a person on a leash walking up to the front door, taking a sniff in a matter of seconds. Breyer Ah, is that what happened here? I thought what happened here was 5 to 15 minutes. Kagan I mean, the record suggests that you put the dog on a very long leash, the dog goes back and forth, tries to figure out where the smell is coming from. It's not just, you know, my first thought was you go up to the door, the dog barks once, and that's it. But you read the record, this dog is there for some extended period of time, going back and forth and back and forth, trying to figure out where the greatest concentration of the smell is. It actually seemed, from my reading of the record, to be, you know, a lengthy and obtrusive process. Your Honor, I think what the record shows is that the dog was on the scene, i.e., at the curb, walking up, going back into the car, and then leaving for a total of 5 to 10 minutes. Walking up to the front steps, sniffing, alerting, and leaving is a matter of seconds or minutes. It's not the dog isn't up there for 5 to 10 minutes. It happens very quickly. I think in thinking about reasonable expectations of privacy, it is important to keep in mind physically what's happening in these houses. These people are growing drugs in the houses with the aid of electricity and light and heat, and they need air conditioning in order to control the heat. And that air conditioning is blowing a very strong odor of drugs out into the public, and the people know that. They know that. We know they know that because they use mothballs, which Officer Padraha found here at the front of the house, outside of the house. And so what you're talking about, although we talk about what's going on in the home, really what's happening here is odor of legal contraband is being blown out into the street, and someone is coming up to it and using their God-given senses in a way that humans and dogs have used for centuries. Roberts. Roberts. We've had a lot of discussion about whether it's 5 minutes or 15 minutes or whether it's mothballs. I understood the issue before us to be whether or not under the Fourth Amendment it is a search for a dog to come up to the door and sniff, not with respect to we're not making a judgment, I thought, on the probable cause in light of the totality of the circumstances, but the ground of decision below was this is a search when the dog sniffs. That you need probable cause just for the dog to sniff. Now, that's absolutely right. And the dog sniff itself clearly is not a physical invasion in the same way that looking is not a physical invasion under the common law. And the dog we think is a sniffing. In the abstract, it's the sniffing at this point, the sniffing at a person's front door, right? Well, that's true, Your Honor, but I think if it wasn't a search for the police officer to walk up there and sniff and report smelling live marijuana, then it wasn't a search when Frankie walked up there and alerted to the presence of an illegal narcotic. I didn't say it wouldn't be a search if the police officer himself did that. What if he went there with the intention of smelling at the door? He's going there to search, and he shouldn't be on the curtilage to search. I think it's been conceded in this case, at least it was below, that the officer could walk up there, knock on the door, report the smell of marijuana, and that that was not a search. Mr. Garre, this is what we said in Kato, and I'm just going to read it. We said, We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search, at least where, as here, the technology in question is not in general public use. So what part of that do you think separates your case from this one? In other words, what part of that language does not apply in this case? Well, first of all, Frankie's nose is not technology. It's he's using, he's availing himself of God-given senses in the way that dogs have helped mankind for centuries. So does that mean that if we invented some kind of little machine called a, you know, a smell-o-matic, and the police officer had this smell-o-matic machine, and it alerted to the exact same things that a dog alerts to, it alerted to a set of drugs, meth and marijuana and whatever else, the police officer could not come to the front door and use that machine? Your Honor, I think the contraband rationale would be the same. It would be different in that you don't have technology in this case. And I think that's an important distinction, because as we read Kilo, the Court was very concerned about advances in technology, and that's just not true for a dog's nose. So your basic distinction is the difference between, like, a machine and Frankie. Well, we should not understand Frankie as kind of a sense-enhancing law enforcement technology, but we should think of him as just like a guy. Your Honor, I think that's true for two reasons. One is Frankie is using the same sense of smell that dogs have used for centuries. So this isn't the case where if you allow a dog to sniff today, he might use x-ray vision in the future. That's not going to happen. And the other thing is that Frankie is using the use of dogs for their sense of smell, which everyone agrees is extraordinary. Mankind has been using them for law enforcement type purposes for centuries. Ginsburg. But not this purpose. I know you said centuries, but I think you recognize that it wasn't until the 70s when the dogs were used to find culprits. But to use it in this way, I think it was only since the 70s. Well, to use it for drug detection purposes, that's right. But they've been using dogs to track thieves for centuries, going back before the founding. Scotland Yard used dogs to track Jack the Ripper. That's the same type of way in which they're being used here. The fact is today they're looking for drugs in this context, but. There's no dispute that dogs can smell what human beings can't. Is that correct? It's not that we can find a machine to put it on a human being to enhance their sense of smell. Dogs can do something human beings can't. They have a much better sense of smell. That's right. But I think if you look. You have to treat him like a guy to think that he is not like technology in terms of augmenting what a human being can do. He's not augmenting what a human being can do. He's substituting what a human being can do. He's, he's, the dogs no doubt have an enhanced sense of smell compared to the officer. But I think that's really not functionally different than using an airplane to look into the house, like in Florida v. Riley. And in that sense, I think this case is a lot like that. In Florida v. Riley, the officers used a helicopter to fly over the drug house and they saw exposed marijuana. Here, you're using the drug detection dog to smell the odor of marijuana that is being pumped out of the house into the street. And the people who use the house know that. They know that. And we know they know that because the mothballs were present. Mothballs are a masking agent. People don't have a legitimate expectation of privacy. This Court has held in things that they knowingly exposed to the public, even in the home, that's what the Court said in Florida v. Riley, it's what it said in Katz itself. And I think here, one way to resolve it is to say people who live in grow houses with a distinct odor of marijuana, who know that that is being pumped out in the street because of the air conditioning that they need to run the grow houses, there's no invasion in their expectation of privacy when either a man or a dog, when lawfully present on the property, uses their God-given senses to detect that. If I could reserve. Sotomayor, you don't have to. Roberts, thank you, counsel. Mr. Harsky. Mr. Chief Justice, and may it please the Court, I would like to array to two points that respond to the Court's questions. The first is the question of whether the officer and the dog were lawfully in place, whether they could approach the front door, was conceivable, and if so, how did they do it? And the second is whether the officer and the dog were lawfully in place, was conceivable,    and if so, how did they do it? And I want to make sure that the Court has cited that. Ginsburg, I didn't understand the concession to be that the police could come to the dog, with the dog, the sole purpose of the dog being to detect contraband. Well, let me give the Court specific citations on that. The court of appeals, the Florida court of appeals found that the dog and the officer were lawfully in place. That's JA pages 104, 105, 112, 116, and 120. Before the Florida supreme court at oral argument, Respondent conceded that there was no reasonable expectation of privacy in the porch, and the Florida supreme court accepted that concession. That's Petition Appendix page 31, also noted by the dissent in pages 78 to 79. In the brief in opposition to cert, Respondent said that the police could approach the front door for a knock and talk, and made no separate argument about the dog presence there making it not lawful. So as this case comes to the Court, it is with the dog and the officer lawfully in place at the front door, approaching the front door just like any Girl Scout, trick-or-treater, or anyone else could. And just to respond, Justice Ginsburg, to the questions that you raised, the police officer's purpose in approaching the front door does not mean that the officer can't come to the door. The Court has said in many contexts that officer purpose doesn't matter, and it doesn't matter if the officer is looking for a lost child. We're thinking that that's. Ginsburg. You're agreeing with Mr. Garre that the police could take a dog and go down every house on the street, every apartment in the building? Well, assuming that the police can lawfully be in the place that they are going with the dog, which is conceded here. The house just like this house? If they are approaching the front door using the normal path, because the dog only detects contraband, yes, they could be used in those circumstances, but that's not happening. There have been justices who have warned about that. Any home, any home anywhere, and we should say that that's okay, and we can say it's okay because the government won't use it. There are justices that have warned about this for over 30 years, and these problems have not come to fruition. There are restraints on police resources. There's the potential for community hostility. If you look at the cases that have arose in the courts of appeals. This Court has dealt with an item that was seized before, a piece of luggage, a car. They have not dealt with the dog sniff in the context of a home that's not seized. But in Caballos, where admittedly the Court did not decide the specific issue, it distinguished the case of Kyllo as saying that that was finding out about lawful activity in the home, and that a person's the critical distinction between Kyllo and the dog sniff in Caballos is that a person does not have a reasonable expectation of privacy and contraband. Kennedy, I just, again, as I told Mr. Garre, I just can't accept that as the premise for the case. The argument we're having about whether there is a reasonable expectation in society generally, whether or not the police, because of limited resources, are not going to have drug use, that's all fine. But this idea that, oh, well, if there's contraband, then all the rules go out the window, it's circular and it won't work for me, I mean. Well, that's — I wanted to be sure to respond to that, Justice Kennedy, because I would hate for the Court to have the impression that all the rules go out the window. That's not the case. What we're talking about here is a sniff that would allow the police to go to a detached and neutral magistrate to say that we have a reasonable possibility that it will work. Fine. But don't ask me to write an opinion and say, oh, we're dealing with contraband here, so we don't need to worry about expectation of privacy. There is simply no support for that, because Caballos cited Jacobson, and Jacobson was where the contraband was — fell out of the package, and it was in plain view. So that just doesn't work, at least for me, in this case. Well, the reasoning in Jacobson, though, the Court said that the rationale, the reason for its decision in place, is because when you're talking about people's reasonable expectations of privacy, they have both a subjective and an objective component. So it's not just that you want to keep something private, it's that you need to have a legitimate expectation that you can keep that private. And the Court has said over and over in Place, in Caballos, in Jacobson, that you do not have a legitimate expectation with respect to contraband. That doesn't mean that the case is fair. Kennedy, again, I don't think the cases go that far, because those were cases in which the contraband, Jacobson, was in plain view. Everybody knows that it falls out of the package. At that point, you don't have any — what you're saying is, oh, well, if there's contraband in the house, then you have no legitimate expectation of privacy. That, for me, does not work. What we're trying to say, Justice Kennedy, is not that you lack any privacy expectation in the home. That's why you need to get a warrant before going into the home. All the dog sniff allows is for the police to try to go to a magistrate and establish probable cause to get a warrant. Kennedy, that's fine. We can talk about reasonable suspicion. That's all okay. Kagan, how does what you're saying, Mr. Harsky, square with Carrow? Because in Carrow, the only thing that the beeper alerted to in the home was the can of ether, which was clearly an item that was being used for drug manufacture. And there was nothing else other than that item, which you might not call it contraband, but it was evidence of illegality, this can of ether. There was no thought that it was used for anything else. And that was the only thing that the beeper alerted it to, and yet, nonetheless, we said, you know, of course that's a search. I think that my answer touches on the point that you made, which is it was not contraband. The police thought that it might be evidence of a crime, but the Court did not say it was contraband. And actually, there was a discussion at the oral argument where defense counsel made very clear that ether has many lawful uses. That makes it different from what the Court considered in place. This came after the Court's decision in place. Kagan. Well, not lawful uses in somebody's house. I mean, maybe lawful uses in a factory or in an operating room, but nobody has cans of ether in their house unless they're making drugs. Well, with respect, Your Honor, the defense counsel, I think, correctly suggested in the Carrow oral argument that, in fact, there are lawful uses in photography labs and houses and the like. He actually had an expert that came to the suppression hearing in that case and testified about the various lawful uses of ether in a house. So I think as the argument came to the Court, the government was not making an argument that that was contraband or evidence of a crime. The government was just saying, oh, it's very limited information because we had already tracked the ether to the house, so you weren't finding out much. And the Court said basically what it said in Kilo, which is it might not be much, but it's still about lawful information activity in the house, and that's protected. But in Cabales, the Court came back and said, sure, we've said Kilo, lawful activity in the house, but your interests in protecting contraband are different. Those are not legitimate interests. And the Court has said that again and again and again. Kagan. But in Kilo, and I think this was what Justice Kennedy was saying, in Kilo there was already a seizure that had happened, and the Court just said this is no — this is really no greater an intrusion. Well, with respect, when we look at the — when we look at the language in these cases in Cabales and the like, you know, the Court wasn't saying, oh, it's not a search because this is already — this had already been seized and nothing more was happening. The Court said it was not a search because there's no legitimate expectation of privacy. And just to be clear, the question about whether folks have a reasonable expectation of privacy with respect to contraband in their house has to take into account two facts. First, that we're only talking about contraband, but also that dogs have been used and known for scenting with their sense of smell. Breyer. Yes, but what I'm curious about, and it's an unanswered question for me, is we are considering whether the dog sniff is permissible. So I wanted to know what a dog sniff at the front door involves. And in page 96, 97, 98 of the Joint Appendix, with which you are familiar, it explains that. It isn't just going up and that's it. It's a process called bracketing. They describe it at length. The officer, the dog officer, said he was in a rush that day and it didn't take more than 5 to 10 minutes. And my question, really, is whether an ordinary homeowner expects people to walk down the curtilage, and with a big animal, and the animal, they don't knock, they behave in the page 96, 97, 98 way. I subjectively think, well, that's pretty unusual behavior, whether it's a policeman or anybody else. So what do you respond? This sniff occurred very quickly, and it is 5 to 10 minutes, and it's 96, 97. Right. I think the 5 to 10 minutes, like counsel said, was the whole process of bringing the dog up to the door, et cetera. The sniff happened very quickly. But putting that to the side, what the dog is doing is sniffing things that have been exposed to the public from inside the house, smells that the officer himself could smell, could smell in plain smell. And the Court has said in other cases, like in Place, that what the dog is doing is very limited in scope. It happens very quickly. There's no physical invasion. It's something that actually this Court has said in Flora v. Royer is something that we want officers to do because it's very limited. Could I follow up on Justice Breyer's question, because it strikes me as a little confusing. Does the dog, as soon as he or she is at the door, sniff and sit or sift and not sit? Or does the dog – I mean, you've talked about the sniff is immediate. What is the 5 to 10 minutes? The 5 to 10 minutes, as I read the record, was the whole process. The dog sniff, I think, took seconds or maybe a minute or two. And the whole process is what? That they were – that they met at the front gate, that they were walking up to the door, that the dog did the sniff, that the – that he talked to the other officer and then he went back to his car, which was parked, I think, some length of time away. So what – But it doesn't take the 5 to 10 minutes to walk to the door. So the officer walks to the door, the dog sniffs right away, and then – Well, the dog sniff, he has to find the strongest source of the odor. So he starts sniffing right away, he sniffs around for a few seconds, he finds the strongest source of the odor, and he sits down at that point. Where in the record do I find the few seconds point? Well, I think that probably the sites that Justice Breyer gave are the sites that describe it, so I'm not sure that there's something more specific than that. Thank you, counsel. Thank you. Mr. Bloomberg. Mr. Chief Justice, and may it please the Court. Police officers taking a narcotics detection dog up to the front door of a house is a Fourth Amendment search for two distinct and separate reasons. First, when police reveal any details inside a home which an individual seeks to keep private, that is a Fourth Amendment search, and that is exactly what a narcotics detection dog is doing, revealing details in the home the individual seeks to keep private. That's your first reason, and I don't want you to be deterred from giving us the second. But if we can concentrate on that for a minute, that seems to me a proposition that's equally unacceptable to what the government is saying, that you have no interest in contraband. The police often, when they have ordinary conversation with people, want to find out details of what that person is doing, where the person lives, what goes on in the Hello. Have you had a nice time at the park today? I see you're coming home with your children. Is this where you live? This is all routine conversation that we always have in order to try to find out what people are doing, what they're like, where they live. So I think this statement, and you've repeated it quite accurately from what you have at page 16 of your brief, just goes too far. Our decision to establish that police action which reveals any detail an individual seeks to keep private as a search, that is just a sweeping proposition that, in my view, at least cannot be accepted in this case. I think it's just too sweeping and wrong. Justice Kennedy, I would add a few words to the end of that statement. Anything that an individual seeks to keep private in the home, and that's the difference. Your hypothet about conversation, certainly a police officer can talk to someone and ask them questions about that. Well, the police officer talked with somebody at the police station or walking down the street about what their occupation is, do they work at home. They're trying to get information that's perfectly legitimate. Certainly, but in that hypothet. Well, then your broad statement simply does not work. Suppose you have someone who has been guilty of a crime. He has the body. He's committed a murder. And he has the body in the home. He certainly wants to keep that private, right? And he foolishly and mistakenly leaves the blinds open in the room where the corpse is lying. And a policeman at a great distance has a telescope and he looks through the blinds and he sees the corpse. Can the police go into the home? In that situation, the person inside the home has knowingly exposed what is inside the home to the public. Oh, no, he hasn't knowingly. He was careless. Well, but I understand in your hypothet that he knowingly left the blinds open. He wanted to keep it private. Well, certainly. And the defendant in Riley wanted to keep the marijuana private. Well, you could say the same thing here. They wanted to keep private the fact that they were growing the marijuana, but they used a means of suppressing the heat that made it impossible to keep it private. Well, that's. They were careless. I don't believe there's anything in the record to indicate that the air conditioner was blowing the smell of marijuana out from the house in a very strong manner. As a matter of fact, there were mothballs there, and Detective Bartelt, the dog handler that was standing at the front door as well, testified without contradiction or without hesitation he didn't smell anything. So if Mr. Garre's representation about an air conditioner basically blowing the smell of marijuana outside the house so that anybody would smell it. What were the mothballs there for? The mothballs presumably were there to mask the smell of an odor coming from the house. It's manifesting an expectation of privacy. Well, that's my question. Are we talking about the expectation of privacy in the marijuana or the expectation of privacy in the odor? The expectation of privacy on the details, what's going on inside your house. Well, no, that can't be right. Because if you're letting smoke out that, I don't know, from the burning of the body or something, you don't say, well, because he's trying to conceal that, you can't rely on the smoke. But that's knowingly exposing what's inside the house. Well, I guess the question here is if you appreciate the fact that the odor is coming out to the extent that you're going to put mothballs all around the house, it seems to me that you may have an expectation of privacy in the marijuana plants, but you don't have an expectation of privacy in the odor because you're emitting it out into the world, and it's the odor that was detected. But assuming that's what the mothballs were there for, that's to keep the odor inside the house so that the public cannot find, cannot detect that odor unless you go out there. Well, but that's like saying you put the drugs in a bag to protect them from observation outside, but you use, you know, a clear bag rather than a, you know, opaque one or something and you weren't very successful. And by the way, you began, you said, assuming that's what the mothballs were there for. That is what they were there for, isn't it? There's no other reason than just. There's really no evidence in the record as to the only people who testified at the hearing and the motions were pressed were the two police officers. Well, I think your first reason is so broad, it is clearly incorrect. It's so broad. You ought to go on to your second reason. Yes, I was going to ask for your second point. Well, the when a police officer takes a narcotics detection dog up to the front door of a house, that's a Fourth Amendment search, because that is a physical trespass upon the constitutionally protected area of the curtain of the home. But, you know, we've had hundreds of years of trespass cases in this country and in England. Has there been, do you have a single case holding that it is a trespass for a person with a dog to walk up to the front door of a house? Well, there are cases that go back to the, I don't, I'm sorry I don't have the citations, but there are cases in the 1700s that established that basically a dog running onto someone else's property is a trespass. Of course, the question was if a dog comes on to a private property. If a dog on a leash is brought up to the front door of a person's house, was that a trespass at the time when the Fourth Amendment was adopted? If it was without the consent of the homeowner, yes. It was a trespass. And what is the case that says that? I do not have the case. Breyer. You're assuming the conclusion in these things. I mean, I thought since Katz, the rule has been whether the homeowner has a reasonable expectation of privacy in, which is infringed or violated or interfered with when the government acts. So it's a question of does he have that reasonable expectation, so now we're back to exactly where we were. Your opponents say, no, there is no reasonable expectation of privacy. Well, after DECT, a person with a dog coming up to the door and going, all right. Now, your response to that is what? My response to that is that does violate the resident's reasonable expectation of privacy. And then the question was, as Justice Alito put it, why? He says we go back to the 17th century as far as you want, and there is no law that a person won't walk up to the dog, to the door with a dog on a leash and sniff, which is, he says, which your opponents say is what happened here. And your response to that is? My response to that is that any entry onto private property in the 1700s was a trespass, was a tort of trespass, unless it was with consent. What about, Mr. Blumberg, the government cited many, many pages in the record. I just took the first one. One, the petition, appendix to the petition 104 on 105. The court said the officer and the dog were lawfully present at the defendant's front door, and you were told that that was conceded by you a number of times. Absolutely not, Justice Ginsburg. What I said in the Florida Supreme Court, I was given a hypothet about an officer coming up by himself without the dog to knock on the front door and talk to the homeowner. And I said that, I conceded that would not be a violation of a reasonable expectation of privacy, and this Court has stated as much in Kentucky v. King. And then the Court said to me, what's the difference? And I said, the dog. And that's exactly what I'm saying here. Okay. So if that's clear, you do concede if the police officer walks up to the door, smells it himself, no problem there. Is that right? If the police officer is knocking on the door, part of a knock and talk, yes. But if the police officer. But smells it himself, so there's no problem there. So the difference is the dog. So what difference does the dog make? Suppose the dog were not doing this 10-minute bracketing that Justice Breyer was talking about. Suppose this really were a very simple procedure. The dog comes up, takes a sniff, barks, sits down. And, you know, to make it even more, the dog's not a scary-looking dog, the dog's a cockapoo. So just like, you know, your neighbor with his cockapoo walks up to your door all the time, that's what this police officer has done. Why do you win, then? Well, whether it's a cockapoo or a Frankie who from all the pictures appears to be a very cute dog, it's not what the dog looks like. It's what the dog is doing on the front porch. The dog does what your neighbor's dog does. Well, no, this dog, the neighbor's dog does not search for evidence on your front porch. That's the key distinction. Mr. Blumberg, I think you're, with respect, misguided to concede that if it was just the officer alone without the dog, it would be perfectly okay. I did not mean to concede that. Well, I thought you did. I was about to return to your. I would assume you would say that if the officer walks up there with no intention to knock and talk, but just walks up to the door with the intention of sniffing at the door, you would consider that to be a violation, wouldn't you? And that was the point I was going to make in my first testimony. Well, our Fourth Amendment case – our Fourth Amendment cases are very clear that they don't turn on the subjective intent of the particular officer. And I'm not arguing that. I am arguing that. I thought you just said it depends on whether or not he's going up to the door to sniff or going up for something else. It depends what the officer does at the front door, not what his state of mind is. If the officer goes up to the front door and starts sniffing around the cracks and crevices. Yeah, sure, if he's down on his knees. But what if he goes up to the front door and sniffs? I mean, he's got to breathe. I mean, how do you tell whether it's different? I don't understand. He's going up to drop off, you know, tickets to the policeman's ball, and he smells marijuana. What is that? Is that a violation or not? It is not. Because he's not performing any type of search. But if he's going up to sniff, it is a violation. Not going up to sniff. If he goes up there and does sniff, he starts searching around, looking in the windows. He goes to deliver the tickets and he sniffs. He doesn't intend to sniff before he goes, but he goes to deliver the tickets and he smells the marijuana. Is that a search? No, because he's not performing any kind of search. And this Court has repeatedly held that if officers do the same thing, two officers go up to two identical houses. One goes up with the subjective intent to sniff. The other one goes up with the subjective intent to drop off the tickets to the policeman's ball. Your answer is one is a search, one is not a search. No. And I am not in any way, shape or form tying it to the subjective intent. All right. Scalia, I think you're wrong not to accept that. I think our case is supported. I think you cannot enter the protected portion of a home, which is called the curtilage, with the intention of conducting a search, that that is not permitted. I think our case is established. I believe the language is true. It's fine to say, I don't think it's true, that the intent of the officer is never relevant. It is relevant in that context. The reason for the officer going on to protected property, if he's going on just to knock on the door to sell tickets to the policeman's ball, that's fine. If he's going on to conduct a search, that's something else. The language in this Court's opinion in Jones is for the purpose of conducting a search. Can odors be in the equivalent of plain sight, plain smell? In other words, the officer goes up to drop off the policeman's ball tickets, the door is open, he sees the dead body. The officer goes up to sell the policeman's ball tickets, and he sees, he smells the marijuana. Okay in both cases, right? Yes, Mr. Chief Justice. So this depends upon how strong the odor is. This Court's decisions establish that a police officer does not have to close his eyes when he goes up to the front door of a house to do a knock and talk. He does not have to hold his nose to prevent. Anything that he naturally observes using his ordinary senses when he is there for a lawful purpose such as a knock and talk is fine. If the the let's say it's a townhouse that goes right up to the sidewalk. If the police go by with their dog, intending to sniff, and the dog alerts, it's on the sidewalk, but two feet away is the front door, that's okay, right? Well, that would not be a trespass. That would not be a search. So it's okay. No, it's not okay, respectfully, because the dog would still be revealing details inside the home that the officer could not reveal using his or her ordinary senses. That's our first argument in this case. Well, let me make sure I understand you. The policeman is walking down the sidewalk with his dog. The dog stops and alerts. That doesn't constitute sufficient probable cause to get a search warrant to go into the townhouse. There's been no entry onto the property. It's just a policeman walking with his dog. Well, but I assume on your hypothetic it's a policeman walking with his narcotics detection dog up and down the street. Sure. A dog that he knows. He's walking the dog. He's not out searching. He's walking the canine dog, and the dog alerts on a house without any trespass. You think that's still bad? Yes. And I would submit that would basically be the same thing as a police officer walking up and down the street with a thermal imager that's turned on. But you do say that this is an easier case. This is an easier case, of course, because the police officer in this case, and not only the facts of this case, but the question presented is going up to the front door of a home. I thought the relevance of technology was that technology that we have now was not necessarily was not, much of it was not available at the time when the Fourth Amendment was adopted. So we can't tell what the, what people in 1791 would have thought about it. But that's not true of dogs. Dogs were around. They've been around for 10,000 years. Dogs were around just as we know? They were used to detect scents for 10,000, for thousands of years. Certainly, they were available for that purpose in 1791, weren't they? But in 1791, dogs had not been trained to detect criminal activity within a house. They had been trained to track people, had they not? Yes. Dogs have been tracking people. In 1791, if someone, if the police were using a blood, or somebody was using a blood hound, or someone who was suspected of a crime, and the blood hound, and they used the blood hound to track the person to the front of, to the front door of a house, would that have been regarded as a trespass? Yes. I believe it still would. And what's the case that says that? Well, I do not have a case that says that taking a blood hound up to the front door of a house would be a trespass. But if you analyze it under the definition of what a trespass is, it's an unlawful entry onto private property without consent of the homeowner. And there's no implied consent, actual or implied consent. I don't believe a homeowner back in the 1700s impliedly consented to police coming up to the front door of his house with a blood hound, even though everybody knew they could. Are there cases that say that the implied consent exists only where the person is coming to the door for a purpose that the homeowner would approve if the homeowner knew the purpose of the person coming to the door? The specific doctrine is implied consent by custom. And so you look to what is it customary for people to accept in terms of people coming onto their property. Kennedy, how is that different from what Justice Breyer, I think, correctly indicated in our inquiries, whether there's a reasonable expectation of privacy? In a way, that's circular, because if we say there is, then there is. If we say there isn't, then there isn't. But if we're looking at community values in general, isn't it a reasonable expectation of privacy? It's very similar. The two doctrines are very similar. Whether you're saying it's a violation of a reasonable expectation of privacy, Justice Breyer. Kennedy, let me ask this. I think I know your answer would be, suppose the policeman has little microphones on so they can talk into their radio, the microphone on their lapel. Suppose the policeman goes to the homeowner and he has the microphone on his lapel on so his partner can hear the conversation and they can, the two of them talk about it later, they're talking to the homeowner. Is that an unlawful search? If the homeowner chooses to engage in conversation with that officer and his conversation is over, he's overvoted on the microphone. It doesn't occur to him that that mic is on. But, again, when you talk to the police officer, that's a reasonable possibility. You don't have to, that's not a reasonable expectation of privacy, that if you talk to a police officer, that that might be going out to another police officer that's in the car down the street. But there's no, the homeowner does not. But maybe it is a reasonable expectation, maybe it isn't. I frankly think that might be harder than the dog case, or that you can make a stronger case for a reasonable expectation of privacy. If the homeowner is making a lot of marijuana with odors coming out, he knows that a dog or a person might smell it. But, again, this particular case is not, the question presented does not hinge on whether or not a normal officer could smell it, because this officer, Detective, I'm sorry, Detective Bartelt said he did not smell it. It does hinge on what is a reasonable expectation of privacy, and that's what we're trying to find out. Breyer. Breyer. I'll look at this later, but I'm rather surprised. My understanding of the case law was the Chief Justice's, and I thought what you're supposed to look at is the behavior of the individual, the police officer, who comes to the door or looks into the house, not his subjective motive. Now, as we just heard, you said, and with support here, that Jones changed that. But I don't know what in Jones changed that. Jones was the case where the police did, in fact, go to a person's car and physically put something in it. That's something that tracked. That's behavior. Correct, isn't it? But the definition. So what is it in Jones that said what we're supposed to look at is not behavior, but the subjective intent of the officer? It's the language in Jones that says one of the elements in determining whether or not a physical trespass constitutes a search under the Fourth Amendment is, is there a physical trespass onto a constitutionally protected area for the purpose of conducting a search? Those are the three elements. Roberts. Roberts. What is the constitutionally protected area in this case? In this case, the curtilage of the home. Even though it's the sidewalk where people – there's an implied license for people to walk up to the front door? Well, that was your hypothesis. I mean, it may be a search. I see that. It's not a sidewalk here. It's the front door. It's not a sidewalk here, is it? No, no. It's the front door of the home. It's the front door. But there's an implied license to walk up to the front door, right? Only, only to do certain things. There's an implied license to go onto the curtilage for most people. Yes. The curtilage is not sacrosanct. To do certain things, such as to try and sell Girl Scout cookies, to knock. Even a police officer can go onto the curtilage to knock onto the door – I'm sorry, to knock on the front door to try and engage the person inside the home in a conversation. Could we go back to the concession that was asked of you, whether what you conceded in the Florida court or didn't? Have you conceded that the police officer, San's dog, if he had come up to the door and knocked, that that would have been permissible, that that was not a search or seizure? If what the police officer was doing at the front door was a knock and talk. That was the point. Sotomayor, did he have a right, under the facts of this case, he had been told that in this house they were growing marijuana by a confidential informant. Assume that's all that he had. Would he have had a right to walk up to the door, knock on it, and start asking questions? Without the dog. Let's – San's dog. Yes. Yes. That's Kentucky v. King, I believe. All right. So you are conceding that he had license to walk on to or walk to the door and ask questions. There's implied consent for a police officer to go up to the front door, knock on the door, and attempt to engage the person in the house in conversation when they open the door. Why is that? If you took a poll of people and say, do you want police officers who suspect you of possibly engaging in criminal conduct to come to your front door and knock on the door so they can talk to you and attempt to get incriminating information out of you, would most people say, yes, I consent to that? In terms of consent, again, it's implied consent by custom. And I think at this point it's customary for people to expect that police officers may come to your front door and knock on your front door to try and talk to you. You don't have to talk to them. Sotomayor, I guess the bottom line is that are you taking – it sounds to me like you're saying there's no implied consent to bring a dog onto my property. Absolutely. Absolutely. And certainly not in our context. Mr. Garre said differently, that there's an implied consent for your neighbor to bring the dog up for anyone else but a police officer. Is that what you're saying? There's an implied consent for anyone else or there's no implied consent, period? I think a strong argument can be made that there's no implied consent for anyone to bring a dog up to the front door of your house, because as you pointed out, a lot of people don't like – don't like dogs and some people are allergic to dogs. I thought you were talking about a dog trained to detect contraband. Yes. But I believe the hypothetic was just any dog. But certainly when it's a dog trained to detect contraband, there's no question that no one impliedly consents to that happening, and there's no question, as Justice Breyer pointed out, that a homeowner has a reasonable expectation of privacy that that's not going to happen, that somebody could. Alito, did you draw a distinction between dogs that are not drug detection dogs and ordinary dogs? Would you draw the same distinction between a police officer who is not expert at detecting the smell of methamphetamine and a police officer who is expert at detecting the smell of that drug? In terms of the right of that officer to come up to the house and knock on the door? No. There wouldn't be any distinction to that. You impliedly consent and you have no reasonable expectation of privacy that any type of police officer is going to come and knock on your front door and try and talk to you. Breyer. Not a police officer. If we start – policemen have to know how to behave. And in this area, they can behave the same way as other people can behave, and we expect them to behave, even though their motive differs. They are always trying to find crime. That's what I thought the law was. So I've been trying to figure out, just what you say, but in a slightly different form, do people come up to the door with dogs? Yes. Do the dogs breathe? Yes. Do, in fact, policemen, like other people, come up and breathe? Yes. Do we expect it? Yes, we expect people to come up and breathe. But do we expect them to do what happened here? And at that point, I get into the question, what happened here? And I'd be interested in your view on that. And just to clear up the factual, I don't believe that what happened here in terms of the use of the drug detection dog took 5 to 15 minutes. It didn't take 5 to 15 minutes. It certainly took, I would say, at least 1 or 2 minutes, because what happened here is that the dog goes up to the front door of the house, and again, this is on 96, 97, and 98, the officer goes from the street, over the curb, up to the front door of the house, with the dog basically dragging him up to the front door of the house. They go up this walkway, and the picture of the home is in the appendix of the brief, and then the dog crosses the alcove, the area right in front of the house, and once he gets in that area, the dog starts violently bracketing back and forth, pulling on the leash. The dog handler testified that the other officer had to stay back because it was so violent that people could get knocked down by what's happening. And for a period of time, the dog goes back and forth, back and forth, and then at some point goes to the crack on the bottom of the front door, sniffs that, and then the process finally stops. He sits down. So that's factually what happened. Ginsburg. Mr. Blumberg, the Florida, the appellate court, the court of appeals, did say that the officer and the dog were lawfully present. But you say you didn't make that concession. Blumberg. And that's – I did not make that concession, and no, I certainly did not concede that, but the Court found that. And that's the point I wanted to make. The courts, both courts in Florida squarely addressed that issue, Justice Ginsburg. There is a whole section in the opinion in the Third District Court of Appeals saying the officer and the dog were lawfully present. They didn't – that section doesn't go, defense counsel concedes that issue. That issue, that part of the opinion goes, we find that the officer and the dog were lawfully present. So it's squarely before the court. Alito, do we have to accept that as a statement of Florida law? I'm sorry, I didn't hear the beginning of your question. Do we not have to accept that as a statement of Florida law? No. No? The issue is whether or not that's a violation of the Fourth Amendment. And just because the Third District Court of Appeals found – that's what's before the court today. That's why the issue is squarely before the court. The Third District Court of Appeals decided the officer had the right to go up and be there on the front porch with the dog. The Florida Supreme Court disagreed. There's a passage in the decision in the Florida Supreme Court that says an officer going up to the door – can go up to the door and do a knock and talk, but when the dog is there, that is a qualitatively different matter. That issue is squarely before the court. Maybe this is the same question Justice Alito asked earlier, but people have different senses of smell. So what if there's some person who has, you know, the best sense of smell in the department, and they say, well, let's use him to go do the knock and talks when we suspect drugs? That way he may discover the odor of marijuana when other people wouldn't. Is it wrong for them to select the person with the best sense of smell to do that? I think that would lead more to a determination that there was a trespass because they selected the officer who had the best sense of smell to go up to that door, so they weren't really going to do a knock and talk. You said knock and talks are okay. Well, but there's – knock and talks are okay, but under your hypothet, it appears that the knock and talk was not really what the officer was going up there for. They picked the officer with the best sense of smell. Sotomayor You're on a really slippery slope with that answer. There's dual motives in everything police officers do. They knock to hope the person comes to the door and that they can see something from the door. They knock. They always have a dual motive. So you're suggesting what? In terms of our rule, that if they select somebody with a sense of smell because they've gotten a tip of drugs in a house, that we give up in that situation the assumption that they went to investigate? No. The rule I'm asking this Court to adopt does not rely on the subjective intent of the police officer. The rule I'm asking this Court to adopt is not. Sotomayor He knocks and he says to the neighbor, who are you? I've gotten a report and I'm smelling drugs, so I know you have drugs in there. That would be fine. That would be plain smell in that. But if he smells first and asks the question second, that's not okay? No. No. What's not okay is if he goes up there to perform a search or if he conducts a search. And again, back to the facts of this case, when a police officer goes up to the front door with a narcotics detection dog, there's no question what that officer is doing. That officer is performing a search. And therefore, if you go to Jones, the officer and the dog have entered, have physically trespassed, because there's no consent to do that, onto a constitutionally protected area, the curtilage of the home, and performed a search. If you just follow the test set forth in Jones and apply it to what happened here and the question presented here, it is a trespass. I thought the rationale in Jones, what Jones added was that it is a search if it was a trespass. Yes. And so I come back to the very first question I asked you. Do you have any authority for the proposition that this would be a trespass? Any case that says this is any trespass case in the last 500 years in any English-speaking country. I don't believe any court has faced this issue as to whether or not taking a police dog up to the front door of a house is a trespass under the common law. Thank you, counsel. Thank you. Mr. Garre, you have 3 minutes remaining. Thank you, Your Honor. First, with the question of how long they were at the scene. The record says that they were at the scene for 5 to 10 minutes. That includes in the car, walking up to the door, which my friend conceded was a minute or two, and then back in the car and leaving. With respect to the bracketing, bracketing just means that the dog is getting excited, moving his head around. This is a passive alert dog. They get a little bit excited and they sit down. It's no different than what a neighbor's dog would do when they get to the front door. Second, with respect to State law, we do think it's important. And Florida has a decision, State v. Moore's Method. Sotomayor, I thought what the dog does, according to the police officer's testimony, is he gave him a long leash so the dog would lead him to the drugs. What the dog did, I thought, according to what I read, was go past the motorcycle to make sure the officer said this. You don't know if the drugs are in the motorcycle. You don't know if they're in the garage. You don't know where they might be. So the dog is permitted to roam around until he catches the scent. Is that accurate? Yes. They're walking up the common path, and you can see it from the picture at the appendage of the brief, and then up to the front door. It's near the front door where he alerted by sitting down. But the point is that he's sniffing all the way around to see. He's sniffing. He's breathing. That's right. With respect to State law, State v. Moorman, 394 S. 2nd, 408 at 409, this was a case that came up during an oral argument in the Supreme Court. It says that under Florida law, there's no reasonable expectation of privacy in the porch, taking into account that visitors and salesmen can come up to the front door, and I think that's pertinent here. Justice Kennedy, if you don't like the contraband rationale, then I hope you would consider the knowingly exposed to the public rationale. Here, the record does show that they, drug houses, do vent the stuff outside. It's page A48 of the Joint Appendix. That's in the warrant, where they talk about what the air conditioning unit does to the scent of marijuana in the house. We know that they knew about that because Officer Bartelt came across the mothballs – that's on page 100 of the Joint Appendix – outside of the house. The mothballs were outside of the house. It means that they knew that the ouders were outside. Kagan. Kagan. I think, Mr. Garza, you have to concede that this is a case about police use, call it a technology, call it a – whatever you want to call it – of something that enhances what normal people can sense. And then the question becomes, do you have a reasonable expectation of privacy in basically people just having their normal senses rather than some technique or method or technology that enhances those senses? So that your implied consent or expectations about your neighbor might differ fundamentally, you know, if the neighbor comes and knocks on your door or if the neighbor brings his magnifying glass and his microscope and everything else and starts testing everything around it, you might say, no, I'm not there for that. Well, and I think that gets back to our point that this is a dog that's been used by humans for centuries by scent, and in that respect it's quite different than the helicopter that was used for aerial surveillance in Florida v. Riley. Thank you, counsel. Counsel, the case is submitted.